279 N.J. Super. 346 (1995)
652 A.2d 1225
DUALL BUILDING RESTORATION, INC., PLAINTIFF-RESPONDENT-SECOND CROSS-APPELLANT,
v.
1143 EAST JERSEY AVENUE ASSOCIATES, INC., DEFENDANT-RESPONDENT-FIRST CROSS-APPELLANT, AND MONSEY PRODUCTS, INC., DEFENDANT-APPELLANT-CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted October 17, 1994.
Decided January 27, 1995.
*349 Before Judges PETRELLA, HAVEY and BROCHIN.
White & Williams, attorneys for appellant-cross-respondent Monsey Products, Inc. (Stephen C. O'Brien, on the brief).
Gruen & Goldstein, attorneys for respondent-first-cross-appellant 1143 East Jersey Avenue Associates, Inc. (Fred R. Gruen, on the brief).
*350 Archer & Greiner, attorneys for respondent-second-cross-appellant Duall Building Restoration, Inc. (Sean T. O'Meara, on the brief).
The opinion of the court was delivered by BROCHIN, J.A.D.
Defendant 1143 East Jersey Avenue Associates, Inc. owned a ten-story building. The front of the building was faced with marble. The other three sides of the building were made of brick and, before the occurrence of the events which are the subject of this law suit, were covered with a reddish-brown asphalt coating, approximately one-half inch or more in thickness that was peeling badly.
Plaintiff Duall Building Restoration, Inc. was in the business of restoring, cleaning, pointing, caulking and waterproofing masonry. On August 10, 1988, Duall entered into a contract with 1143 East Jersey to do "[g]routing and caulking of limestone joints ... painting of brickwork [and] [r]oofing repairs to the designated balconies" on 1143 East Jersey's building. Duall agreed that if it took more than 40 days to substantially complete its work, it would pay 1143 East Jersey liquidated damages of $150 a day. The contract specified that Duall would use "Modac," a waterproofing paint produced by defendant Monsey Products, Inc., to cover the three brick sides of the building. The contract also stated, "All masonry painting shall carry a five year guarantee against peeling or flaking." The contract price for the specified work was $110,000. Later, by a separate document, the parties agreed to certain items of "extra work" or "change orders" totalling an additional $17,465.
After Duall had finished painting the building, but with some other work still undone, it stopped work, claiming that 1143 East Jersey had failed to make a progress payment due to it under the contract. Duall commenced suit against 1143 East Jersey for $34,465. 1143 East Jersey denied liability.
*351 At about the same time as Duall commenced its suit, the Modac paint which Duall had applied to three sides of the building began peeling disastrously. One of the principals of 1143 East Jersey described the peeling as follows:
[T]he entire building is peeling. It's ... going wild. I mean ... the surface is a whole bunch of spaghetti. Maybe noodles, I should say. It's curlicues of surface coming off all over the place.
1143 East Jersey counterclaimed against Duall for the defective application of Modac to its building. Duall impleaded Monsey Products, Inc., the manufacturer of Modac, as a third-party defendant. Duall demanded common-law indemnification from Monsey for any liability incurred by Duall as the result of any defect of Modac. 1143 East Jersey also asserted a direct claim against Monsey, asserting that Modac was defective and that Monsey had therefore breached its express and implied warranties that Modac was merchantable and fit for its intended purpose. 1143 East Jersey also alleged that Monsey had negligently given erroneous advice to Duall about the application of Modac, had negligently failed to supervise Duall's application of Modac, and had negligently failed to warn 1143 East Jersey that the paint was being improperly applied.
The case was tried to a jury which returned its verdict by answering twelve special interrogatories. By its answers to these interrogatories, the jury found that 1143 East Jersey had breached its contract by failing to pay Duall; that the breach was material and therefore relieved Duall from any further contractual obligation under the contract; and that when Duall stopped work on the contract, "what remained to be done to complete the contract [was] what 1143 contends, which included replacements as required in the repair of the balconies and any other work which [1143] claimed had to be done or redone." The jury also determined that Duall had substantially completed its work within 40 working days and therefore was not liable to 1143 East Jersey for liquidated delay damages. The jury awarded Duall $17,465 against 1143 East Jersey for completed work which had not been paid for.
*352 On 1143 East Jersey's counterclaim against Duall, the jury found that Duall had "failed to provide a painting job in conformity with the written guarantee provision contained in the contract." For breach of that guarantee, the jury determined that Duall was liable to pay 1143 East Jersey $185,000.
However, with respect to Duall's claim against Monsey for indemnification, the jury was asked only whether there was an "oral agreement between Monsey and Duall that Monsey would stand behind Duall with a five-year guarantee for labor and materials on all jobs on which Modac paint was used and [that] Monsey was given an opportunity and did approve the surface preparation in advance of the work." The jury's answer was, "no."
On 1143 East Jersey's claim against Monsey, the jury found that Monsey was negligent in "advising that Modac be applied on this surface from which all of the existing coating had not been removed." But the jury also found that that negligence was not a proximate cause of the paint peeling off the building. The jury also answered "no" to the compound question, "Do you find that a breach of express warranty existed as to the effectiveness of Modac as expressly set forth in Monsey's brochure and that 1143 [East Jersey] gave notice thereof to Monsey within a reasonable period of time after discovering same." However, the jury answered "yes" to the question, "Was there a breach of the implied warranty of fitness and use [sic] of this paint as being one that could be used on any existing coating without exception or reservation of any sort?" The jury awarded 1143 East Jersey $185,000 against Monsey "in order for it to obtain a paint job on this building free from peeling for a five year period."
Judgment was entered on the record in accordance with the jury verdict in favor of Duall and against 1143 East Jersey for $17,465; and in favor of 1143 East Jersey and against both Duall and Monsey for $185,000. Following the argument of post-trial motions, the motion judge, who had also presided over the trial, reserved decision on Duall's claim for indemnification from Monsey. *353 The formal judgment entered thereafter includes "judgment ... in favor of ... Duall and against ... Monsey on [Duall's] counterclaim for common law indemnification." If the judge who entered the final judgment provided a statement of his reasons for ruling that Duall was entitled to indemnification, it was not included in the record that has been furnished to us.
Monsey has appealed and Duall and 1183 East Jersey have cross-appealed. We first consider Monsey's appeal.

-1-
Since the jury found that Monsey's negligence was not a proximate cause of the peeling paint, the $185,000 judgment in favor of 1143 East Jersey and against Monsey can only be based on its affirmative answer to interrogatory 10. That interrogatory asked whether "there was a breach of the implied warranty of fitness and use [sic] of this paint [Modac] as being one that could be used on any existing coating without exception or reservation of any sort." Monsey interprets the jury's answer as a finding that it breached its warranty of merchantability with respect to Modac, i.e., the implied warranty codified by N.J.S.A. 12A:2-314(1) and -314(2)(c). By virtue of these sections, every contract for the sale of goods entered into by "a merchant with respect to goods of that kind" includes an implied warranty that the goods "are fit for the ordinary purposes for which such goods are used."[1]See Herbstman v. Eastman Kodak Co., 68 N.J. 1, 8, 342 A.2d 181 (1975). On the assumption that the jury's answer to interrogatory 10 was a finding that it had breached its implied warranty of merchantability, Monsey argues that 1143 East Jersey's judgment against it *354 must be reversed because there is no evidence in the record that Modac is not fit for the ordinary purposes for which it is used.
We agree that the record would not support a finding that Modac is not fit for waterproofing masonry walls, the ordinary purpose for which it is used[2]. However, 1143 East Jersey responds that the jury's answer to interrogatory 10 was a determination that Monsey had breached its implied warranty that Modac was fit for the specific purpose of waterproofing brick walls from which not all of the underlying asphalt coating had been removed. The implied warranty on which 1143 East Jersey relies is codified in N.J.S.A. 12A:2-315:
Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.
The evidence is more than ample to sustain a finding that Monsey breached an implied warranty of fitness for a particular purpose. The jury could readily have found that before Duall signed the contract specifying Modac as the paint to be applied to the asphalt-covered brick walls, it solicited and received Monsey's assurances, conveyed by a sales manager for Monsey's exclusive distributor in the area, that even if Modac was applied on top of asphalt, it would adhere satisfactorily to the underlying bricks, provided only that the loose asphalt had first been removed. Expert testimony was presented that these assurances were mistaken and that the Modac peeled because it was not compatible with the asphalt which had been left adhering to the walls.
Monsey argues in response that even if 1143 East Jersey's claim for breach of an implied warranty of fitness for a particular *355 purpose pursuant to N.J.S.A. 12A:2-315 were meritorious in other respects, lack of privity would bar recovery. The Supreme Court spoke to that issue in Spring Motors Distributors, Inc. v. Ford Motor Co., 98 N.J. 555, 582, 586, 489 A.2d 660 (1985). It declared:
We conclude that the absence of privity between a remote supplier and an ultimate purchaser should not preclude the extension to the purchaser of the supplier's warranties made to the manufacturer....
........
Furthermore, a plaintiff in a suit for breach of warranty against a remote seller, like a plaintiff in a strict liability action, need not establish privity with or negligence by the defendant....
On the other hand, despite these seemingly unqualified pronouncements, the Court also said:
... we do not resolve whether a warranty of fitness for a particular purpose, unlike an implied warranty of merchantability, extends only to parties in privity with the seller
[citing Pawelec v. Digitcom, Inc., 192 N.J. Super. 474, 477-78, 471 A.2d 60 (App.Div. 1984)].

Id. at 589, 489 A.2d 660.
Although the Supreme Court refrained from deciding whether privity is a prerequisite for a suit against a remote seller on an implied warranty of fitness for a particular purpose, we conclude that the logic of Spring Motors Distributors, Inc. demands elimination of privity in that category of suit. For cogent reasons, the Court held in that case that "a commercial buyer seeking damages solely for an economic loss should proceed under the U.C.C. against parties in the chain of distribution." Id. at 578, 489 A.2d 660. The Court's reasoning  that "Insofar as a commercial buyer is concerned, strict liability is not an appropriate basis of a claim for economic loss," Id. at 577-78, 489 A.2d 660  applies just as forcefully to a party suing for breach of an implied warranty of fitness for a particular purpose as to one suing for breach of an implied warranty of merchantability. Since Spring Motors Distributors, Inc. confines a party in the position of 1143 East Jersey to suit under the U.C.C., if the requirement of strict privity were not abolished, 1143 East Jersey would be substantially without a remedy against the manufacturer for economic injury *356 resulting from its producing and selling a defective product. Where, as in this case, the buyer relied on the remote manufacturer's assurances of the suitability of the product for the buyer's particular purpose, the buyer is entitled to a remedy, and we are confident that Spring Motors Distributors, Inc. was not intended to lead to a contrary result. Cf. Perth Amboy Iron Works, Inc. v. American Home Assurance Company, 226 N.J. Super. 200, 210-11, 543 A.2d 1020 (App.Div. 1988), aff'd o.b. 118 N.J. 249, 571 A.2d 294 (1990) (abolishing privity under the Consumer Fraud Act in reliance on analogy of Spring Motors); D'Angelo v. Miller Yacht Sales, 261 N.J. Super. 683, 688, 619 A.2d 689 (App.Div. 1993) ("[I]t seems unlikely after Spring Motors that the Code will bar for lack of privity consumer claims for economic loss against a remote supplier or manufacturer.")
A second potential obstacle to recovery by 1143 East Jersey against Monsey for breach of an implied warranty of fitness for a particular purpose is the requirement of N.J.S.A. 12A:2-607(3)(a) that when goods  the Modac paint, for example  have been accepted, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy...." As previously mentioned, the jury answered "no" to the compound question whether a "breach of warranty existed as to the effectiveness of Modac as expressly set forth in Monsey's brochure and [whether] 1143 gave notice[3] thereof to Monsey within a reasonable period of time after discovering same." This answer requires us to assume that the jury determined that 1143 East Jersey failed to give Monsey timely warning of its breach. Therefore, although the Supreme Court in Spring Motors Distributors, Inc., id., 98 N.J. at 589, 489 A.2d 660, expressly refrained from deciding what, if anything, a *357 remote buyer must do to satisfy the notice requirement of N.J.S.A. 12A:1-607(3)(a), we must decide that issue in this case.
N.J.S.A. 12A:1-201(26) clarifies the meaning of "notify" as follows:
A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it.
In accordance with this definition, we hold that a remote buyer that has suffered economic loss as the result of a manufacturer's breach of its implied warranty of fitness for a particular purpose can "notify the seller of breach" within the meaning of N.J.S.A. 12A:2-607(3)(a) without communicating directly with the seller. See Cipollone v. Liggett Group, Inc., 683 F. Supp. 1487, 1497-98 (D.N.J. 1988) (predicting that the New Jersey Supreme Court would hold that direct notice to the manufacturer was not a prerequisite to suit). A buyer that informs its immediate seller within a reasonable time that there is a problem with an identified product "has taken such steps as may be reasonably required [by N.J.S.A. 12A:1-201(26)] to inform" a manufacturer that is not its immediate seller about the breach. See Church of the Nativity of Our Lord v. WatPro, Inc., 491 N.W.2d 1, 6 (Minn. 1992) (notice requirement satisfied by notice to immediate seller); Seaside Resorts, Inc. v. Club Car, Inc., 308 S.C. 47, 416 S.E.2d 655, 663 (App. 1992), rehearing denied, (1992) (U.C.C. notice provision requires retail buyer to notify only seller who tendered goods to him, not wholesalers or others who sold goods further up chain of commerce); Thomas M. Fleming, Annotation, Subsequent Remedial Measures, 15 A.L.R.5th 119, 152 (1993).
A party harmed by breach of an implied warranty will frequently not have the information necessary to enable it to give a prompt warning of the breach to a remote manufacturer or distributor. Interpreting N.J.S.A. 12A:2-607(3)(a) to impose that requirement would materially reduce the availability of a remedy for the breach. On the other hand, if the party that has been harmed notifies its immediate seller, that seller's self-interest is *358 likely to motivate it to give prompt notice to its immediate seller, and so on up the chain of distribution. In the present case, Duall received prompt notice that Modac had failed in the application for which Monsey had recommended it because the Modac peeled off at about the same time as Duall began its suit against 1143 East Jersey for the unpaid balance due under their contract. That notice satisfied N.J.S.A. 12A:2-607(3). See New Jersey Study Comment 4 to N.J.S.A. 12A:2-607 ("Official comment 4 to section 2-607 [of the U.C.C.] ... indicates that the necessary notification need not be formal, but one that merely apprises the seller of the fact `that the transaction is still troublesome and must be watched.' This notion probably squares with New Jersey case law. See, Johnson v. Hoffman, 7 N.J. 123, 131-2, 80 A.2d 624 (1951)...."); see also Lewis v. Mobil Oil Corporation, 438 F.2d 500, 509 (8th Cir.1971).
We next consider whether the trial court's instructions on the issue of Monsey's liability for breach of an implied warranty of fitness for a particular purpose were inadequate and, if they were, whether that requires reversal of the judgment entered in favor of 1143 East Jersey and against Monsey.
The closing arguments which the attorneys for 1143 East Jersey and for Duall presented to the jury were clearly directed to proving that Monsey's employees had given negligently erroneous advice rather than that Monsey had breached an implied warranty of fitness for a particular purpose. Nonetheless, the facts argued to the jury were material to deciding whether there had been a breach of that implied warranty. Duall and 1143 East Jersey argued that when 1143 East Jersey signed the contract to refurbish its building, it had relied on Duall and Duall had relied on Monsey's expert advice that Modac was fit for the particular purpose of covering brick walls whose asphalt coating would not be entirely removed. For example, the attorney for 1143 East Jersey told the jury,
Monsey's brochure ... says ... all you have to do with this wonder product Modac is remove the loose particles.... You get a product that grabs the building, it seals in whatever remains, it binds it in, it covers over the old coat, and there will *359 be no peel or blister and most jobs last for 10 to 15 years. So what Bernstein [Duall's principal] is saying that he's hearing from [Monsey's] Grindler through Wolfson [the distributor] and what Zagunis [Duall's "foreman" or subcontractor actually doing the work] is saying he's hearing on the site from Grindler is exactly the same as what Monsey says in its brochure. So it's reasonable to believe that in fact Grindler did deliver exactly that opinion.
The trial court's instruction explaining jury interrogatory 10 has to be considered in the light of these arguments to the jury during summations. See e.g. State v. Meneses, 219 N.J. Super. 483, 485, 530 A.2d 824 (App.Div. 1987), certif. denied, 110 N.J. 156, 540 A.2d 160 (1988). The trial judge explained interrogatory 10 to the jury as follows:
In addition to the express warranty, there is ... the claim that there was an implied warranty, and this is set forth as a separate action by 1143 against Monsey. And it's based on 1143's claim that the paint was not chemically and physically compatible with the underlying coating that existed. They contend that there was no limitation or exception that was made by Monsey with respect to the fact that there might not be compatibility with a particular surface or any surface, and it's based on that 1143 claims that without any warning with respect thereto that there might not be compatibility, that there has been a breach of the implied warranty that the paint was fit and proper for use on the coating that existed in this building, and that is what the breach of the implied warranty deals with. That is question number 10 and you'll make a determination as to whether there is that breach, whether  and it reads as follows: Was there a breach of the implied warranty of fitness and use of this paint [as] being one that could be used on any existing coating without exception or reservation of any sort?
[Emphasis added.]
Considered in the context of the entire trial, including the summations, this instruction adequately informed the jury that it was to determine whether 1143 East Jersey was relying on Duall and whether Duall, to Monsey's knowledge, was relying on Monsey's expert advice when 1143 East Jersey contracted to have Duall apply Modac to the brick walls of 1143 East Jersey's building without removing all of the underlying asphalt coating.
R. 4:39-1, deals with special verdicts in the form of special written findings by the jury upon each issue of fact. It reads in part as follows:
The court shall instruct the jury concerning the matters submitted as is necessary to enable it to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right *360 to a trial by jury of the issues so omitted unless before the jury retires submission to the jury is demanded. The court may make a finding as to an issue omitted without such demand, or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

[Emphasis added.]
This rule applies to the present case and provides an alternative ground on which to sustain the verdict in favor of 1143 East Jersey and against Monsey. The jury returned a special verdict by answering questions on material issues of disputed fact. 1143 East Jersey pleaded a breach of implied warranty claim against Monsey, but no party requested the court to submit questions to the jury about whether there had been a breach of implied warranty pursuant to N.J.S.A. 12A:2-315, or pointed out to the court that the language of interrogatory 10 failed to track any implied warranty provision of the Uniform Commercial Code. No party objected to jury interrogatory 10 or to the trial court's explanation of it. Consequently, if the court's jury charge or interrogatories "omit[ted] any issue of fact raised by the pleadings or by the evidence, [the court is] deemed to have made a finding in accord with the judgment on the special verdict." R. 4:39-1; see Stella v. Dean Witter Reynolds, 241 N.J. Super. 55, 70-72, 574 A.2d 468 (App.Div.), certif. den., 122 N.J. 418, 585 A.2d 412 (1990).
As an alternative argument, Monsey contends that, even if it is liable to 1143 East Jersey for breach of an implied warranty of fitness for a particular purpose, "the amount of damages awarded... is against the weight of the evidence in that it included consequential damages for the removal of the preexisting asphalt coating without proof that the need to remove the asphalt was caused by the application of Modac." Monsey points out that $185,000,[4] the amount of the damage award, includes the amount which 1143 East Jersey's expert witness estimated to be the cost of removing all of the asphalt undercoating on the building and *361 repainting it with a new coat of Modac. The cost of removing the undercoating represents two-thirds of that amount. Monsey's maximum liability, it contends, is therefore the amount it would cost to purchase and apply the Modac, exclusive of the cost of removing the undercoating.
We disagree with this argument. According to N.J.S.A. 12A:1-106,
The remedies provided by [the Uniform Commercial Code, N.J.S.A. 12A:1-101 et seq.] shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this Act or by other rule of law.
[Emphasis added.]
According to N.J.S.A. 12A:2-714,
(1)....
(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

[Emphasis added.]
The next section, i.e., N.J.S.A. 12A:2-715, provides for the recovery of "incidental" and "consequential damages resulting from the seller's breach," including "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise...."
The Official Comment to the section of the Uniform Commercial Code from which N.J.S.A. 12A:2-715 was adopted verbatim states:
2. Subsection (2) operates to allow the buyer, in an appropriate case, any consequential damages which are the result of the seller's breach....
3. In the absence of excuse under the section on merchant's excuse by failure of presupposed conditions, the seller is liable for consequential damages in all cases where he had reason to know of the buyer's general or particular requirements at the time of contracting.
*362 The premise of the jury verdict in favor of 1143 East Jersey Associates and against Monsey for breach of N.J.S.A. 12A:2-315 is that Modac was purchased specifically for use on 1143 East Jersey Associates' building in reliance on expert advice from Monsey. Consequently, this is the type of case for which consequential damages are available under N.J.S.A. 12A:2-714 and -715. Without consequential damages, 1143 East Jersey could not be put into the same position it would have been in if the implied warranty of fitness had not been breached. Cf. 525 Main Street Corp. v. Eagle Roofing Co., 34 N.J. 251, 168 A.2d 33 (1961) (The cost of remedying the broken promise is the proper measure of damages in the case of a 5-year guarantee against leaks in a roof.).
Courts have frequently held that consequential damages are available for breach of an implied warranty of fitness for a specific purpose. See e.g. Lewis v. Mobil Oil Corporation, supra, 438 F.2d at 507-8 (consequential damages recoverable by sawmill operator for oil company's breach of warranty of fitness of lubricating oil furnished for operation of hydraulic system included both direct expenses and loss of profits); Emerald Painting, Inc. v. PPG Industries, Inc., 99 A.D.2d 891, 472 N.Y.S.2d 485, 487 (1984) (proper measure of contractor's damages for breach of implied warranty was difference between job's actual cost and what would have been the cost of labor and materials to do paint job had manufacturer's paint been compatible with sealer); John S. Herbrand, Annotation, Sale-Incidental and Consequential Damages, 96 A.L.R.3d 299 (1979). New Jersey law is consistent with these decisions. See Perth Amboy Iron Works v. Am. Home, supra, 226 N.J. Super. at 219-25, 543 A.2d 1020 (breach of warranty damages may include cost of repairs).
Finally, we also reject Monsey's argument that "the trial judge's decision granting common-law indemnity in favor of Duall and against Monsey was error as a matter of law." We decided substantially the same issue adversely to Monsey's contentions in Pawelec v. Digitcom, Inc., 192 N.J. Super. 474, 471 A.2d 60 (App. Div. 1984), overruled on another point, by Spring Motors, supra. *363 In that case, the retailer relied on the manufacturer's catalog in advising its customer that a certain machine was fit for the customer's particular purpose. We held that the retailer was liable to its customer for breach of an implied warranty that the product it sold was fit for a particular purpose and that the retailer was entitled to indemnification from the manufacturer because it had relied on the manufacturer's advice. Cf. Promaulayko v. Johns Manville Sales Corp., 116 N.J. 505, 513-14, 562 A.2d 202 (1989) (in U.C.C. cases as well as in personal injury strict liability actions, the cost of injury should be shifted to the party closest to the manufacturer on the chain of distribution).
On this issue, Pawelec's application of the law is similar to that of cases from other jurisdictions. For example, the present case is similar to Dobias v. Western Farmers Ass'n., 6 Wash. App. 194, 491 P.2d 1346 (1971). In that case a farmer's crop was damaged by a herbicide which he had purchased on the advice of his retailer who had obtained the advice from the manufacturer. The court held that both the retailer and the manufacturer were liable to the farmer for breach of an implied warranty of fitness for a particular purpose, and that the retailer was entitled to indemnification from the manufacturer. The court explained its holding on the latter issue as follows:
When a retailer incurs liability to the ultimate consumer by reason of his negligent reliance upon statements made by the manufacturer of a dangerous product, indemnity will lie. See Prosser, Law of Torts, § 48, p. 280 (3d ed. 1964). Stauffer Chemical manufactured a product and represented to the retailer, as well as to the ultimate user, that it would be relatively safe to use on corn. Commercial expediency requires that the primary duty to test products lies with the manufacturer rather than the retailer, who is a mere conduit of the product. [Citations omitted.]
As Dean Prosser says:
Indemnity is a shifting of responsibility from the shoulders of one person to another; and the duty to indemnify will be recognized in cases where community opinion would consider that in justice the responsibility should rest upon one rather than on the other.
Prosser, Law of Torts, § 48, p. 281 (3d ed. 1964). Thus, between the retailer and the manufacturer, commercial expediency requires the manufacturer, whose duty is to market merchantable products, to exercise the necessary precautions so that the *364 product, if properly used, will be safe. A retailer, with no duty to test the product, can only rely on statements made by the manufacturer.

Dobias, supra, 491 P.2d at 1350.
To the same effect, see Moscatiello v. Pittsburgh Contractors, 407 Pa.Super. 378, 595 A.2d 1198 (1991), appeal den., 529 Pa. 650, 602 A.2d 860 (1992) (where both seller and manufacturer were liable to buyer for economic loss resulting from breach of express or implied warranties, manufacturer was obligated to indemnify seller).
Although Modac, the product at issue in the present case, was merely ineffective in this particular application, not unsafe, the principles enunciated in Pawelec, Dobias and Moscatiello are equally applicable here. Monsey seeks to distinguish them on the ground that the judgment against Duall was based on its express contractual guarantee of its paint work. However, the jury concluded, on adequate evidence, that Duall guaranteed its work because it relied on Monsey's expert advice that Modac could be applied to the brick walls of 1143 East Jersey's building without first removing all of the underlying asphalt coating. Consequently, the distinction offered by Monsey is immaterial.

-2-
In support of its cross-appeal, Duall argues that it had no obligation to honor its contractual guarantee because, according to the findings of the jury, 1143 East Jersey's failure to pay Duall $17,465 for extra work was a material breach[5] that relieved it of any obligation to perform in the future. We agree, of course, that one party's material breach of a non-divisible contract excuses the other party from performing a contractual duty due thereafter. Nolan by Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143 (1990); Ross Systems v. Linden Dari-Delite, Inc., 35 N.J. 329, 340-41, *365 173 A.2d 258 (1961). But this argument assumes that the $110,000 contract which included painting the brick walls with Modac and the supplemental document which provided for additional work were both part of a single, indivisible contract. The trial judge disagreed, ruling that the parties' obligations under the original, $110,000 contract were separable from those specified by the supplementary document under which 1143 East Jersey owed, and failed to pay, $17,465. That, however is a controversy which we do not have to decide. Duall's argument fails for a more fundamental reason  it mistakenly assumes that 1143 East Jersey's failure to pay was the first material breach.
Duall's contract with 1143 East Jersey states that "[a]ll masonry painting shall carry a five year guarantee against peeling or flaking." Even without that express promise, a contract for the provision of services such as the one at issue here includes an implicit promise that the services will be performed in a workmanlike manner and that the result will be fit for its intended purpose. Aronsohn v. Mandara, 98 N.J. 92, 98, 484 A.2d 675 (1984); Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 238-39, 405 A.2d 788 (1979). Duall's contract therefore included an implicit promise that the Modac coating which it applied would not flake and peel almost as soon as it was put on the walls. Duall breached its warranties to 1143 East Jersey when it applied Modac under conditions which resulted in almost immediate flaking and peeling. This was an immediate, material breach which preceded 1143 East Jersey's failure to pay, even though Duall's breach was not discernible until a few months later. See College Point Boat Corporation v. U.S., 267 U.S. 12, 15-16, 45 S.Ct. 199, 200-201, 69 L.Ed. 490, 493-94 (1925); Mardell v. Harleysville Life Ins. Co., 31 F.3d 1221, 1231 fn. 16 (3rd Cir.1994) petition for cert. filed, 63 U.S.L.W. 3422 (U.S. Oct. 24, 1994); Restatement (Second) of Contracts § 385, comment a (1981). Consequently, even if the trial judge had not decided that the obligation which 1143 East Jersey breached was separable from Duall's obligations under the *366 painting contract, Duall would not be relieved of its obligation to pay damages for its breach.
Duall also argues that the amount of damages which it was found liable to pay to 1143 East Jersey should not have included the cost of removing the pre-existing asphalt coating before repainting. The trial court instructed the jury:
Now Duall indicated therein that it would guarantee that the paint job would be free from peeling for a period of five years.... The cost or expense of course of providing that would be the measure of damages, and that is what question number seven deals with. ...
Under the facts of this case, that was the only fair measure of damages for breach of Duall's guarantee. 1143 East Jersey was entitled to the amount of damages which would give it what Duall promised. The evidence showed that to provide 1143 East Jersey with waterproofing that will last five years, all of the asphalt remaining on the walls of the building must first be removed and the building must then be repainted. The only evidence on that issue was that the total cost would be $185,000. The jury therefore correctly concluded that that is the amount to which 1143 East Jersey is entitled. 525 Main St. Corp. v. Eagle Roofing Co., supra, 34 N.J. at 255-56, 168 A.2d 33 (cost of repairs, or cost of replacement if replacement is needed to obtain the promised performance, is appropriate measure of damages for breach of guarantee against leaking roof); Price v. B. Construction Co., 77 N.J. Super. 485, 490, 187 A.2d 25 (App.Div. 1962), certif. denied, 39 N.J. 239, 188 A.2d 178 (1963) (measure of damages for breach of one-year warranty to keep cellar free from water was cost of keeping cellar water-free indefinitely); cf. Perth Amboy Iron Works v. Am. Home, supra, 226 N.J. Super. at 218-220, 543 A.2d 1020 (special damages of buyer of yacht who can prove that he uncovered damages caused by breach of warranty in piecemeal fashion are not limited to cost of yacht).

-3-
1143 East Jersey cross-appeals only from the trial court's refusal to award it prejudgment interest. All of the parties agree *367 that interest is to be awarded in contract actions according to equitable principles. Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 478-79, 541 A.2d 1063 (1988); Bak-A-Lum Corp. v. Alcoa Building Products, 69 N.J. 123, 131, 351 A.2d 349 (1976). 1143 East Jersey has not demonstrated that the court's denial of prejudgment interest was an abuse of discretion.
The judgment appealed from is therefore affirmed in all respects.
NOTES
[1] The implied warranty of merchantability also includes warranties that the goods are such as to pass without objection in the trade under the contract description; that, in the case of fungible goods, they are of fair average quality within the description; that they are of even kind, quality and quantity within the variations permitted by the agreement; that they are adequately contained, packaged and labeled; and that they conform to the promises or affirmations of fact made on the container or label, if any. N.J.S.A. 12A:2-314(2)(a)-(f). These warranties, however, are not relevant to the present case.
[2] 1143 East Jersey argues that the evidence was sufficient to show that Monsey breached its implied warranty of merchantability because there was substantial evidence that Modac failed to "conform to the promises or affirmations of fact made on the container or label...." N.J.S.A. 12A:2-314(2)(f) However, the "promise[] or affirmation[]" on which 1143 East Jersey relies was contained in a Monsey brochure, not on the container or label of the product.
[3] The court did not expressly define "notice." From the context, however, the jury would have understood the court's question as asking whether 1143 East Jersey communicated directly with Monsey to inform it about the problems with Modac.
[4] Monsey actually uses the figure of $182,000. This was the amount offered by the expert as his estimate. At one point in his testimony, he adopted his questioner's rounded approximation of $185,000.
[5] Because the parties have not briefed or argued the questions, we have not considered whether, under the facts of this case, the materiality of a breach was a question of fact for the jury or, if it was, whether the court was obligated to define "material breach."